IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KEVIN JOHN SOLLITT ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO.: 1:09-cv-00043 |
| vs. ) | |
| ) | JUDGE JAMES GWIN |
| KEYCORP ) | |
| ) | **FIRST AMENDED COMPLAINT** |
| and ) | |
| ) | *(Jury Demand Endorsed Hereon)* |
| KEYBANK NATIONAL ASSOCIATION ) | |
| c/o Paul Harris, General Counsel ) | |
| 127 Public Square ) | |
| Cleveland, Ohio 44114 ) | |
| ) | |
| and ) | |
| ) | |
| XYZ Corporations 1-10, ) | |
| ) | |
| Defendants. ) | |

NOW COMES Plaintiff, Kevin Sollitt, by and through undersigned counsel, and for his First Amended Complaint against Defendants states as follows:

## THE PARTIES

1. Plaintiff Kevin Sollitt is a resident of the City of Westlake, the County of Cuyahoga and the State of Ohio.

2. Defendant Key is an Ohio corporation with a principal place of business in Cuyahoga County, Ohio.

3. KeyBank National Association is a federally chartered national bank with a principal place of business in Cleveland, Ohio. Defendants Key and KeyBank National Association will be referred to collectively herein at simply "Key."

4. Counsel for KeyCorp in this litigation has agreed to accept service of the Amended Complaint on behalf of KeyBank, N.A.

5. Unnamed XYZ Corporations 1-10 are entities associated with Key by a formal or informal relationship, including, but not limited to, subsidiaries of Key and clients of Key. Plaintiff reserves the right to name these additional parties, if and when they are identified during discovery.

## JURISDICTION AND VENUE

6. By virtue of its February 11, 2009 ruling, the United States District Court for the Northern District of Ohio has exercised jurisdiction over this proceeding. For reasons more fully explained in Plaintiff's *Motion for Remand* and related filing filings, Plaintiff respectfully contends that jurisdiction properly lies with the Cuyahoga County Court of Common Pleas.

7. In light of the Court's ruling on the jurisdictional question, venue is appropriate in the United States District Court for the Northern District of Ohio, Eastern Division, because the actions giving rise to Plaintiff's claims occurred in this jurisdiction. Consistent with his position regarding jurisdiction, Plaintiff respectfully contends that venue should properly lie in the Cuyahoga County Court of Common Pleas.

## FACTUAL ALLEGATIONS

*Mr. Sollitt Joins Key and Over His Ten Years of Employment
Manages Billions of Dollars in Currency Risk and Generates Millions of Dollars In Trading
Revenue while Rising to become the Head (Sector Manager) of the Foreign Exchange
Trading Desk*

8. Plaintiff Kevin Sollitt was first hired by Key in or about August 1998, beginning work in November 1998. In accepting employment with Key as a Foreign Exchange Trader, VP level, Mr. Sollitt agreed to relocate from London, England to Cleveland, Ohio with his then-pregnant wife and his two-and-one-half year old daughter.

9. Mr. Sollitt was initially hired at an annual salary of $125,000 and promised a bonus of $25,000 to be paid in March, 1999. Based upon his early performance, this bonus payment was increased to $35,000.

10. On average, foreign currency traders were expected to generate a profit of $500,000 per trader on an annual basis.

11. In every year from 2000 forward, Mr. Sollitt performed exceptionally well, at times personally generating more than $1 million in annual trading revenue for Key.

12. In 2003, Mr. Sollitt was promoted to the position of Senior Vice President based on his strong performance.

13. In 2006, Mr. Sollitt was promoted to become head or sector manager of the foreign exchange trading desk. Despite the significant increase in duties, workload and associated responsibility, however, Mr. Sollitt did not receive a commensurate salary increase at the time of his promotion.

14. In the final three years of his employment, Mr. Sollitt earned annual performance-based bonuses of $375,000, $450,000 and $385,000, respectively.

15. In any one year, Mr. Sollitt was ultimately responsible for managing the risk of billions of dollars in assets under Key's control.

***As Head of the Foreign Exchange Trading Desk, Mr. Sollitt Began To Recognize Improprieties On the Part of the Foreign Exchange Sales Team***

16. As the Head of the Foreign Exchange trading desk, Mr. Sollitt reported directly at first to Richard Owens, the Executive Vice President and Managing Director of Key's Capital Markets Group. In early 2007, Mr. Owens appointed Denise Shade as Manager, Foreign Exchange, to oversee both the Sales and Trading sides of the foreign exchange department. Ms. Shade reported to Richard Owens.

17. Mr. Sollitt's counterpart within Key's Foreign Exchange Sales was Flavio Giust, the head, or sector manager, of the Institutional (I-bank) side of the group. In that role, Mr. Giust was responsible for marketing Key's Foreign Exchange services to companies, including many of Key's largest foreign currency customers. Mr. Giust also supervised a group of sales personnel and reported to Denise Shade.

18. The department also included a Tom Simenic, a long-time Key employee, whose work involved the administrative details of recording foreign currency transactions made by Key on behalf of their clients. In this role, Mr. Simenic was uniquely positioned to have access to both the representations and sales quotes being made to the customers and the actual prices at which the transactions are being made.

19. As co-founder, former head of the sales group and now sector manager for I-bank sales in the Foreign Exchange department, Mr. Giust wielded tremendous influence over the entire department, including Ms. Shade whom he had originally hired and had previously supervised

20. Traditionally, Mr. Sollitt had shared a close and amiable working relationship with Mr. Giust.

21. However, in the months prior to his termination, Mr. Sollitt gained first hand knowledge of certain sales practices carried out by sales personnel, which cause him great concern.

22. By way of explanation, in the context of foreign exchange transactions, the difference between the price paid by the customer and the price paid by the financial institution to complete a transaction is referred to as the "spread." This spread represents the profit made by the financial institution supplying liquidity to their client and is measured in increments of one

ten thousandth of a U.S. dollar. One ten thousandth of a U.S. dollar is referred to in industry parlance as a "pip." One pip on one million base currency is 100 USD.

23. During the last year of his employment, Mr. Sollitt learned that sales employees, including, but not limited to Mr. Giust, would routinely misrepresent the best available price that could be offered on certain currency transactions involving large corporate clients. Key's clients reasonably relied upon these misrepresentations in electing to use Key to effectuate their foreign exchange currency transactions.

24. For instance, Mr. Sollitt learned that Mr. Giust affirmatively represented to large corporate clients that the "best price" he could get in the market was as much as one hundred pips above the price that Key currency traders were able to actually get in the marketplace. These misrepresentations to the client resulted in millions of dollars in windfall profits for Key and tens of thousands of dollars for the individual sales employees.

25. Encouraging this sort of practice, Mr. Giust and Ms. Shade presented at least two seminars to all sales and trading employees in the Foreign Exchange department discussing strategies for increasing the performance of the department. Among the strategies advocated by Ms. Shade and Mr. Giust was the practice of building close relationships with large corporate clients in order to facilitate aggressive pricing of transactions. Mr. Giust and Ms. Shade also recommended and approved of the practice of taking losses on small transactions by offering prices below those that could be had in the marketplace, so as to establish good will with clients and reduce scrutiny on larger transactions where Key enjoyed sizeable profits as a result of affirmative misrepresentations made to clients.

26. It was well known that Mr. Giust was among the most aggressive in employing these questionable tactics with customers.

27. Consistent with his presentation at the aforementioned seminars, Mr. Giust facilitated this practice by maintaining close personal relationships with the decision makers at large clients. Mr. Giust was known to take his clients out for dinners and other entertainment costing hundreds of dollars to facilitate this process, a method he recommend Mr. Sollitt use to diffuse problematic situations, on occasion.

28. While the practice of misrepresenting the best prices available on the marketplace was tacitly implied, if not endorsed, by senior management, lower level sales employees were made to be scapegoats if clients raised questions about Key's pricing representations.

29. Upon information and belief, at least two sales employees were terminated after clients expressed concerns that they were manipulating rates.

### *In What Was Considered an Act of Rebellion by Upper Management, Mr. Sollitt Questioned the Unlawful Practice of Sales Employees Affirmatively Misrepresenting To Clients the "Best Price" that Could be Obtained on the Market*

30. In or about March 2008, Mr. Sollitt worked with Mr. Giust on a large transaction for Parker Hannifin. Over Mr. Sollitt's objection and at the insistence of Mr. Giust and the approval of Ms. Shade, this transaction was executed in a manner which jeopardized the perception of Key amongst Inter-bank counterparties in the Foreign Exchange marketplace, a vital source of liquidity for the bank's core business needs. When Mr. Sollitt pointed out that the proposed manner in which the transaction be completed could potentially be injurious to Key's longer-term and future standing in the foreign currency banking community, Mr. Giust replied, "All I care about is this deal."

31. The next day, Mr. Sollitt again expressed his concern regarding the manner in which the Parker Hannifin transaction was handled to Ms. Shade. In response, Ms. Shade conceded that she should have over-ruled Mr. Giust and allowed Mr. Sollitt to execute the

6

transaction as he saw fit. Indeed, she observed that Mr. Giust had crossed the line by insisting on the manner in which the deal was completed.

32. Following the Parker Hannifin transaction and exchange of dialog, Mr. Sollitt and Ms. Shade were required to travel to New York City to visit some of Key's main liquidity providers, to provide explanations and address questions regarding the manner in which the Parker Hannifin deal was executed, all the while preserving the client's anonymity.

33. The practice of getting close to powerful industry and client contacts enabled Mr. Giust in this instance to take advantage of the 'personal' relationships he fostered and encouraged others to replicate. In this case Mr. Sollitt provided the market-rate on the Parker Hannifin trade, absorbing the risk generated in a volatile market and providing to Mr. Giust a competitive rate. Mr. Sollitt later learned that Mr. Giust took not only a normal spread on this trade but that after some time had passed from the original transaction, Mr. Giust called Parker Hannifin back and changed the rate to disadvantage the client, thereby reaping extra profit for Key and for himself. Mr. Giust told Parker Hannifin that the new rate was necessitated by an error on the part of the trading desk. In reality, however, the price provided by the Mr. Sollitt and the trading desk never changed. Mr. Giust's actions netted Key hundreds of thousands of dollars in additional profit on this single transaction.

34. Following the trade, Mr. Sollitt raised objections to Mr. Giust's actions in belatedly extracting hundreds of thousands of dollars from a client under false pretenses. Indeed, Mr. Sollitt complained to Mr. Guist directly that the exorbitant profit extracted from Parker Hannifin represented the value of several manufacturing jobs.

35. Over the next several months, Mr. Sollitt continued to express opposition to Ms. Shade over the practices of Mr. Giust, including his practice of misrepresenting to clients the best possible price that Key could obtain on a given transaction.

36. During this time, Mr. Guist's contact with Mr. Sollitt, which had previously been friendly and frequent, became strained and essentially ceased.

37. Further, upon information and belief, Mr. Owens came to view Mr. Sollitt's objections to the unlawful business practices of the Key sales team as a rebellion and defiance of his own authority over Ms. Shade, Mr. Giust and the entire group.

38. Nevertheless, between March and July of 2008, Mr. Sollitt continued to voice objections regarding Mr. Giust's business practices to Ms. Shade and others. Mr. Sollitt's continued objections were well known to Mr. Giust and Mr. Owens.

### *Mr. Sollitt's Employment Is Terminated In Retaliation for his Opposition to the Unlawful Business Practices of Mr. Giust and his Sales Team*

39. On or about August 20, 2008, Mr. Sollitt was summoned to a meeting with Liane DiGiandomenico of Key's human resources department.

40. At that meeting, Mr. Sollitt was asked to sign a form saying that he would not disclose the contents of this meeting to anyone except his personal attorney. He was then told that his PC had been flagged for inappropriate use and as a result his employment may be terminated for a violation of Key's "Electronic Communications Use Standard" policy, CS32.03.

41. Later in the day on August 20, 2008, Mr. Sollitt was called to another meeting by Richard Owens and was told that as result of the investigation of the contents on his PC, his employment was terminated immediately for a violation of Key's "Electronic Communications Use Standard" policy, CS32.03.

8

42. Specifically, Mr. Sollitt, a ten-year employee who had contributed millions of dollars of profit to Key's bottom line, was terminated for receiving "emails of an inappropriate nature between May 6, 2008 and July 14, 2008." Further, Mr. Sollitt was accused of forwarding inappropriate e-mails from his Key e-mail account to his personal e-mail account on two occasions.

43. Notably, Mr. Sollitt was never alleged to have accessed or distributed any inappropriate electronic content.

44. Likewise, there is no suggestion that Mr. Sollitt ever viewed any inappropriate content on his Key computer.

45. Upon information and belief, several other individuals were terminated on the same day and within the same week as Mr. Sollitt and for similar reasons, including Mr. Simenic, the foreign exchange department employee with unique access to information regarding the pricing of foreign exchange transactions.

46. Mr. Sollitt's termination for an alleged violation of "Electronic Communications Use Standard" policy, CS32.02, was pretextual insofar as other individuals terminated at the same time under the same rationale committed policy violations which were far more severe than those alleged against Mr. Sollitt and because individuals who engaged in violations similar to those alleged against Mr. Sollitt, but who did not object to unlawful business practices, were not terminated.

47. Indeed, upon information and belief, individuals employed by Key, including individuals employed in the foreign exchange department, who have regularly engaged in and continue to engage in flagrant violations of the "Electronic Communications Use Standard"

9

policy, CS32.03, but who did not object to unlawful and unethical conduct on the part of high ranking and profitable employees were not terminated.

## COUNT ONE

### (Wrongful Discharge in Violation of Public Policy)

48. The preceding allegations are incorporated by reference as if fully set forth herein.

49. A clear public policy exists prohibiting Key and the employees of its Foreign Exchange Sales Group from, among other things, affirmatively misrepresenting material facts concerning prices offered to customers and upon which customers reasonably relied. Furthermore, there is a clear public policy which prohibits Key from securing a writing by deception by which a pecuniary obligation is incurred.

50. Key's action in terminating Mr. Sollitt's employment after he voiced his objections to Key's business practices jeopardizes the aforementioned public policies.

51. The decision to terminate Mr. Sollitt's employment was motivated, at least in part, by his actions in protesting the unlawful business practices of Key and its foreign exchange sales staff.

52. Key had no legitimate business justification for terminating Mr. Sollitt's employment.

53. Key's action in terminating Mr. Sollitt's employment for reasons contrary to public policy was intentional, willful, reckless and malicious.

54. As a direct and proximate result of this illegal activity, including, but not limited to pain and suffering, emotional distress, and the loss of past and future salary, wages, benefits, and other privileges and conditions of employment.

WHEREFORE, Mr. Sollitt prays for relief as follows:

A. All remedies available for the claim of Wrongful Termination in Violation of Public Policy, including, but not limited to past and future economic and non-economic damages in excess of $25,000, back pay, front pay, lost benefits, punitive damages, interest, all attorneys' fees, expert fees, and costs.

B. Any other relief that this Court deems appropriate.

                                              Respectfully submitted,

                                              */s/ Shannon J. Polk*
                                              Shannon J. Polk (0072891)
                                              Andrew A. Kabat (0063720)
                                              Haber Polk, LLP
                                              1111 Superior Ave., E., Suite 620
                                              Cleveland, Ohio 44114
                                              (216) 241-0700
                                              (216) 241-0739 (facsimile)
                                              spolk@haberpolk.com
                                              akabat@haberpolk.com

                                              Attorneys for Plaintiff
                                              Kevin J. Sollitt

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims that may be tried to a jury.

                                              */s/ Shannon J. Polk*
                                              Shannon J. Polk (0072891)