UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                              :
KEVIN JOHN SOLLITT                            :
                                              :      CASE NO. 1:09-CV-43
        Plaintiff,                            :
                                              :
vs.                                           :      OPINION & ORDER
                                              :      [Resolving Doc. Nos. 44, 60 & 63.]
KEYCORP, *et al.*                             :
                                              :
        Defendants.                           :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendants KeyCorp and KeyBank, N.A. (collectively, the "Defendants") move for summary judgment in this Edge Act suit. [Docs. 44, 63.] Plaintiff Kevin John Sollitt ("Sollitt") opposes this motion. [Doc. 60.] For the following reasons, the Court **GRANTS** the Defendants' motion.

**I. Background**

Plaintiff Kevin John Sollitt, a former employee of Defendant KeyCorp, has sued KeyCorp for allegedly wrongfully discharging him in violation of public policy. [Doc. 1-1.] As part of his claim, Sollitt argues that his termination for improper computer usage was pretextual and that he was actually fired because he objected to certain transactions and practices of KeyCorp's foreign exchange ("FX") sales department. [*Id.* at 9.]

Defendant KeyCorp hired Plaintiff Sollitt in 1998 for the position of vice president of FX. [Doc. 72-1 at 27, 29.] In 2006, KeyCorp promoted Sollitt to sector manager for the FX trading desk; his responsibilities included generating revenue for KeyCorp by trading foreign currency, managing

Case No. 1:09-CV-43
Gwin, J.

the risk associated with foreign currency transactions undertaken for KeyCorp clients, assisting the FX marketing employees, and engaging in some business development activities. [*Id.* at 39, 42-44.] Sollitt earned more than $500,000 per year (in total compensation) during each of his last three years of employment. [Doc. 44-1 at 45-46.] Bonus payments accounted for the majority of Sollitt's compensation. Denise Shade, the manager of the FX group, was Sollitt's direct supervisor during his last 18 months of employment. [Doc. 44-12 at 3.]

In April 2008, Plaintiff Sollitt became concerned that Defendant KeyCorp was employing questionable practices relating to the marketing of foreign currency transactions. Sollitt especially questioned a large foreign currency transaction that KeyCorp handled on behalf of Parker Hannifin Corporation ("Parker") on April 3, 2008. [Doc. 60-10 at 2.] This transaction involved "two [FX] trades, with Parker needing to obtain a total of approximately 250 million Canadian dollars." [*Id.*]

According to Plaintiff Sollitt, Defendant KeyCorp made a profit of approximately $220,000 on the first part of the Parker transaction by adding a quarter percent spread to the rate earlier quoted to Parker. [Doc. 44-14 at 3-5.][1/] Further, Sollitt argues that on the second part of the transaction, Flavio Giust, the sector manager for the FX sales desk, [Doc. 72-1 at 39-40], contacted Parker and changed the contract rate after the entire transaction closed to increase KeyCorp's profits, [Doc. 60-10 at 2.] Sollitt states that to explain this change to Parker's representative, David Ostro, Giust falsely stated that there had been "trader error." [*Id.*] In reality, Sollitt says that no such error had occurred. [*Id.*] Following the completion of the Parker transaction, Sollitt contends that Giust

---

[1/]In a typical FX transaction, the sales person must obtain a "cover rate" from a trader based upon the market price. [Doc. 44-14 at 72.] This cover rate reflects the rate at which KeyCorp could cover the transaction while accounting for the inherent risk associated with foreign currency transactions. [Doc. 44-12 at 73-76.] KeyCorp's sales person would then add a "spread" to the cover rates representing the profit that KeyCorp would make on the transaction. [Doc. 44-14 at 72.] Together, the cover rate and the spread constitute the contract price. [Doc. 44-12 at 134-136.]

-2-

Case No. 1:09-CV-43
Gwin, J.

"bragged that he was able to extract additional profit from the Parker transaction as a result of his strong relationship with Parker." [*Id.*]

The Defendants argue that there were no improprieties with respect to the first part of the Parker transaction because there are no set rules governing maximum spreads on FX transactions; if customers do not like the quoted prices, they may simply go elsewhere. In other words, KeyCorp owed Parker no fiduciary duty and it could act to its own advantage and to Parker's disadvantage with respect to FX transactions. The Defendants also state that, even if KeyCorp did have some duty to treat its customers fairly, Plaintiff Sollitt was not a sales person and he therefore did not know what spreads would be fair or unfair. [Doc. 72-1 at 173.] Moreover, the Defendants contend that KeyCorp did not act improperly with regard to the second part of the Parker transaction; Giust mistakenly quoted a rate to Parker before that rate had been "locked in" by the trading desk and, when Giust realized his mistake and noticed that the rate had changed a few minutes later, he simply called back Ostro, Parker's representative, and asked to adjust the price. [Doc. 44-14 at 4-6.] The Defendants also point out that Ostro ultimately accepted the corrected rate because it was competitive with the rates quoted by other banks. [Doc. 48 at 6.]

Immediately following the completion of the Parker transaction, Plaintiff Sollitt met with Giust and Shade to discuss the transaction. [Doc. 72-1 at 235.] During the meeting, Sollitt objected to Giust's actions because he felt that Giust had lied to Parker to induce it to agree to the different rate and to obtain a bigger profit for KeyCorp. [*Id.* at 235-236.] The day after this meeting took place, Sollitt again met with Shade and reiterated his objections to the way in which the Parker transaction was handled; he broadly questioned the transaction, saying at one point that Giust's actions were potentially unethical and "verg[ed] on fraud." [*Id.* at 244.] Sollitt does not allege,

Case No. 1:09-CV-43
Gwin, J.

however, that he complained about Giust's supposed misconduct to Richard Owens, the head of the FX department, Shade's supervisor, and the individual who ultimately terminated Sollitt.[2/] [*Id.*; *see also* Doc. 44-9 at 5-7.]

In the months following the Parker transaction, Plaintiff Sollitt reviewed FX transactions logged into Defendant KeyCorp's internal FX database. [Doc. 60-10 at 3.] According to Sollitt, he began to notice that KeyCorp was routinely charging exaggerated spreads on transactions involving large corporate clients. [*Id.*] Further, Sollitt noticed that KeyCorp's sales personnel often secured the large, profitable spreads by representing that the price offered to the client was the "best price" that could be obtained. [*Id.*] Relatedly, Sollitt observed that KeyCorp obtained exaggerated profit margins by treating its clients' employees to free meals at expensive restaurants and to free tickets to sports events. Sollitt continued to complain to Shade in the months leading up to his termination about the ethics of these practices. [*Id.*]

In July 2008, Defendant KeyCorp began using IronPort software to monitor the e-mails of KeyCorp employees including Plaintiff Sollitt to ensure that these employees were complying with KeyCorp's Code of Ethics and Electronic Communications Use Standard (CS 32.03). [Doc. 47 at 2.] Accessing or forwarding e-mails containing pornography, nudity, or otherwise offensive images or language would violate both the Code of Ethics and CS 32.03 and could result in termination. [Doc. 47-2 at 3; Doc. 47-3 at 7.] Sollitt certified that he had read the Code of Ethics and the accompanying policies throughout the duration of his employment at KeyCorp. [Doc. 44-4, 5, 6.]

---

[2/]Owens also indicates that he did not know anything about Sollitt's complaints regarding the Parker transaction both before and after Sollitt was terminated. [Doc. 44-9 at 7.] Sollitt does state, however, that he assumed that Owens knew about Sollitt's complaints because Shade had indicated that if an employee "raised an issue about something they thought was illegal, unlawful, or unethical," she would "immediately go to Richard [Owens] and let him know that we had an employee that had an issue." [Doc. 44-12 at 155.]

-4-

Case No. 1:09-CV-43
Gwin, J.

The IronPort software flagged Plaintiff Sollitt's account because he had received and forwarded inappropriate e-mails, some of which contained nude images or other pornographic content. [Doc. 46 at 3.] Apparently, Sollitt forwarded the offensive emails to a private email account that he maintained. No evidence suggests that he forwarded these e-mails to any other individuals or accounts.

Senior Employee Relations Consultant Liane DiGiandomenico investigated Plaintiff Sollitt's e-mail account, as well as the accounts of other KeyCorp employees that had been flagged by the software. [*Id.*] In the course of her investigation, DiGiandomenico discovered that Sollitt had received over 80 e-mails containing inappropriate content, including pornographic images and videos, from May 1, 2008 until July 14, 2008. [*Id.*] Sollitt had also forwarded at least 10 of these e-mails to his personal e-mail account. [*Id.*] Based on her initial review, DiGiandomenico recommended that Sollitt be fired to her manager, Patricia Wyant. [*Id.*]

Wyant discussed this preliminary recommendation with Debbie Kaput – the Human Resources Director assigned to the Capital Markets Group – and Richard Owens on August 19, 2008. [Doc. 60-14 at 25.] As a group, these individuals agreed with DiGiandomenico that Sollitt should be terminated. [*Id.*]

Following Wyant, Kaput, and Owens's agreement that Plaintiff Sollitt should be fired, DiGiandomenico continued her investigation and interviewed Sollitt on August 20, 2008. [*Id.* at 4.] Sollitt admitted that he had received and forwarded inappropriate e-mails to his own email account and that he understood that such actions were prohibited by Defendant KeyCorp's policies. [*Id.* at 4.*] Following this interview, DiGiandomenico and Wyant again met with Richard Owens and again recommended that Sollitt's employment be terminated; Owens subsequently fired Sollitt, as well as

Case No. 1:09-CV-43
Gwin, J.

another employee in the FX group who had also been found to have violated KeyCorp's electronic communications policies [*Id.*]

Plaintiff Sollitt filed a complaint containing a single cause of action against the Defendants in the Court of Common Pleas, Cuyahoga County on December 15, 2008. The Defendants removed the action to this Court on January 8, 2009. [Doc. 1.] On July 6, 2009, the Defendants filed a motion for summary judgment on Plaintiff Sollitt's sole claim for wrongful discharge in violation of public policy. [Docs. 44, 63.] Sollitt opposed the Defendants' motion for summary judgment on July 20, 2009. [Doc. 60.] For the following reasons, the Court **GRANTS** the Defendants' motion.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale, LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004) (citing *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986))).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323 (quoting FED. R. CIV. P. 56©). However, the moving party is under no "express or implied" duty to "support its motion with

-6-

Case No. 1:09-CV-43
Gwin, J.

affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *See id.* at 586. Nor can the nonmoving party rely upon the mere allegations or denials of its pleadings. F<small>ED</small>. R. C<small>IV</small>. P. 56(e).

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *Thomas v. Cohen,* 453 F.3d 657, 660 (6th Cir. 2004) (citations omitted). "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale,* 361 F.3d at 301 (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir. 1996)) (internal quotations omitted).

### III. Analysis

In their motion for summary judgment, the Defendants argue that they are entitled to judgment as a matter of law on Plaintiff Sollitt's claim that he was wrongfully discharged in violation of public policy. Because no genuine issues of material fact exist with respect to three of the four elements of Sollitt's claim, and because Sollitt must satisfy all four elements to make out

-7-

Case No. 1:09-CV-43
Gwin, J.

his claim, *Hill v. Mr. Money Fin. Co. & First Citizens Banc Corp.*, 309 Fed. Appx. 950, 965 (6th Cir. 2009), the Court agrees with the Defendants and grants summary judgment in their favor.

To establish his claim of wrongful discharge in violation of public policy, Plaintiff Sollitt must demonstrate that: (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);" (2) "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);" (3) the "plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element);" and (4) the "employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529-30 (Ohio 2002) (citations omitted). "The first two elements are questions of law to be determined by the court, while the latter two elements are questions of fact to be determined by the trier of fact." *Aldrich v. Greg*, 200 F. Supp. 2d, 784, 789 (N.D. Ohio 2002) (citations omitted).

The Court finds that Plaintiff Sollitt does not satisfy all four elements of his claim for wrongful discharge in violation of public policy. Although the Court acknowledges that genuine issues of material fact may exist with respect to the fourth element of Sollitt's claim because Sollitt could show at trial that Defendant KeyCorp lacked overriding legitimate business justification for terminating Sollitt, no genuine issues of material fact exist with respect to the other three elements of the claim. Thus, Sollitt's claim necessarily fails.

First, Plaintiff Sollitt cannot demonstrate the existence of a clear public policy. Although

Case No. 1:09-CV-43
Gwin, J.

Sollitt claims that his allegations implicate three sources of public policy – common law fraud,[3/] securing a writing by deception,[4/] and the Ohio Deceptive Trade Practices Act[5/] – he cannot show that Defendant KeyCorp's actions violate any of these "policies."

Courts including the Seventh Circuit have held that banks do not commit fraud in adding spreads to exchange rates (or, in other words, in making a profit on the transactions they carry out) or in changing promised rates because rate information is widely available and the parties involved in FX transactions are sophisticated. *See Interactive Intelligence, Inc. v. KeyCorp*, 546 F.3d 897, 901 (7th Cir. 2008) ("[T]here is nothing confidential in the FX transaction. The . . . [client's] employees knew that exchange rates were available on the Internet and in the *Wall Street Journal*."); *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) ("Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods. The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. . . . Nothing in this transaction smacks of fraud . . . ."); *Compania Sud-Americana de Vapores , S.A. v. IBJ Schroeder Bank & Trust Co.* 785

---

[3/] "The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987).

[4/] "No person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred." O.R.C. § 2913.43.

[5/] A deceptive trade practice includes the making of "false statements of fact concerning the reasons for . . . price reductions." O.R.C. § 4165.02.

-9-

Case No. 1:09-CV-43
Gwin, J.

F. Supp. 411, 419-20 (S.D.N.Y. 1992) (rejecting a fraud claim based upon the change of a promised rate for an FX transaction because the rates were widely available and the parties to the transaction were sophisticated).

In this case, Plaintiff Sollitt cannot show that the Parker transaction was fraudulent. This transaction was conducted in a competitive and transparent market and the entities involved with the transaction were large and sophisticated corporations. In fact, Ostro, Parker's representative in the FX transaction conducted by KeyCorp, checked the quoted rate for the transaction (after Giust changed it) to determine whether it was competitive with the rates offered by other banks before accepting it. As a result, Sollitt cannot establish that Parker justifiably relied upon Flavio Giust's statement that error caused Defendant KeyCorp's pricing to change. *Gaines*, 514 N.E.2d at 712. Moreover, KeyCorp was free to add any spread to their rates; if the rate was too high, the large corporate client would simply conduct the transaction with another bank. Thus, the Parker transaction does not implicate the prohibition against securing a writing by deception or the Ohio Deceptive Trade Practices Act.

Second, even if a clear public policy existed in this case, Plaintiff Sollitt cannot satisfy the jeopardy element of the wrongful discharge in violation of public policy claim. In *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659 (6th Cir. 2005), the Sixth Circuit held that to establish the jeopardy element, "the employee must at least have made clear to his employer that he is invoking a governmental policy as the basis for his complaint, not just his own self-interest. Otherwise, the employer is not effectively put on notice that the employee is acting not only for himself, but also for the public at large." The *Jermer* court also noted that although complaints must not be in writing, they "must do more than merely indicate a preference or make a vague statement.

Case No. 1:09-CV-43
Gwin, J.

[They] must at least connect the employer's conduct in some way to government policy." *Id.*

Here, Plaintiff Sollitt does not satisfy the jeopardy element because he did not make clear to his employer that he was invoking public policies as the basis for his complaints. Sollitt never explicitly stated or even suggested that he thought that Defendant KeyCorp was conducting its transactions in a fraudulent manner or that its actions amounted to misrepresentation. [Doc. 72-1 at 243.] Indeed, he acknowledged that he was uncomfortable making such strong statements to his supervisors. [*Id.* at 244.] At most, Sollitt raised questions about the ethics of the Parker transaction to Denise Shade and Flavio Giust. Additionally, at no point did Sollitt suggest to his employer that his complaints were grounded in the prohibition against securing a writing by deception or the Ohio Deceptive Trade Practices Act. Sollitt's statements regarding the manner in which KeyCorp carried out its transactions were thus decidedly vague and centered on whether KeyCorp's actions were ethical, not on whether they were fraudulent.

Additionally, the jeopardy element looks to whether allowing an employee's dismissal under the circumstances involved in the case could seriously affect the public policy against fraud in similar commercial transactions. In this case, Parker has a significant financial incentive to work with FX facilitators that do not act in a fraudulent manner. Allowing Sollitt's case to go forward provides minimal (if any) incentive for curbing fraudulent conduct in FX transactions. As a result, Sollitt cannot demonstrate that he satisfies the second element of his wrongful discharge in violation of public policy claim.

Third, assuming Plaintiff Sollitt could satisfy the clarity and jeopardy elements, he cannot establish the causation element of his wrongful discharge in violation of public policy claim. In *Herlik v. Cont'l Airlines, Inc*., No. 04-3790, 2005 WL 2445947, at *4 (6th Cir. 2005), the Sixth

Case No. 1:09-CV-43
Gwin, J.

Circuit held that the employee failed to satisfy the causation requirement where there was no evidence that the supervisor responsible for the termination decision knew of the employee's complaints that the employee alleged were the basis of his termination. Further, in *Avery v. Joint Twp. Dist. Mem'l Hosp.,* 504 F. Supp.2d 248, 258 (N.D.Ohio 2007), the Northern District of Ohio held that the employee failed to establish the causation element when the employee demonstrated that he had complained to only one of his two supervisors, who were jointly responsible for his termination; the other supervisor had asserted that he had no knowledge of the employee's complaints.

In this case, Plaintiff Sollitt cannot establish that Richard Owens, the individual who terminated him, knew about Sollitt's complaints regarding the Parker transaction and other KeyCorp transactions. Owens, along with the human resources personnel who recommended Sollitt's termination, states that he did not know about Sollitt's complaints regarding Flavio Giust and the Parker transaction both before and after he discharged Sollitt. In response to Owens's unequivocal statement that he did not have any knowledge of Sollitt's complaints prior to terminating him, Sollitt offers only speculation. He argues that Denise Shade, Sollitt's direct supervisor, must have told Owens about Sollitt's complaints. Such speculation by Sollitt – which is directly contradicted by Owens's and Shade's testimony – is insufficient to withstand a summary judgment motion. *See, e.g., Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004); *Avery,* 504 F. Supp. 2d at 258 n.9.

Not only can Plaintiff Sollitt not show that the individual who terminated him knew about Sollitt's complaints regarding the Parker transaction, but also Sollitt cannot establish a temporal connection between his complaints and his discharge. "[T]he proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Moon*

-12-

Case No. 1:09-CV-43
Gwin, J.

*v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987). In this case, however, nearly five months elapsed between the Parker transaction and Sollitt's complaints regarding the handling of this transaction and Sollitt's termination. The relevant proximity in time thus occurred not between Sollitt's complaints and his discharge, but between the discovery of Sollitt's violation of KeyCorp's policy regarding the use of electronic communication and his discharge. As a result, Sollitt cannot show that he satisfies the third element of his wrongful discharge in violation of public policy claim.

Because Plaintiff Sollitt fails to establish all four elements of his wrongful discharge in violation of public policy claim, the Court must grant summary judgment in favor of the Defendants on this claim.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Defendants' motion for summary judgment.

IT IS SO ORDERED.


Dated: August 21, 2009                       s/        *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE